**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| NPI, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 08-CV-346-TCK-SAJ** |
| | ) | |
| PAGODA VENTURES, LTD., | ) | |
| ARVEST BANK, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court is Plaintiff's Motion to Remand (Doc. 15). For reasons explained below, this motion is hereby GRANTED, and the action is remanded to the District Court for Tulsa County, Oklahoma.

**I.     Factual Background and Procedural History**

In late April 2008, Plaintiff NPI, Inc. ("NPI") and Pagoda Ventures, Ltd. ("Pagoda") entered into a contract for the sale of scrap metal, whereby NPI purchased a quantity of scrap metal from Pagoda for the amount of $3,990,000.00 ("First Contract"). In early May 2008, NPI and Pagoda entered into a second contract for the sale of scrap metal, whereby NPI purchased a larger quantity of scrap metal from Pagoda for the amount of $11,400,000.00 ("Second Contract") (collectively the "Contracts"). The Contracts required NPI to obtain a "standby letter of credit" in the amount of the purchase price. NPI obtained two letters of credit from Defendant Arvest Bank ("Arvest"), one in the amount of $3,990,000.00 and the other in the amount of $11,400,000.00 ("Letters of Credit").

In early June 2008, Kyle Utley ("Utley"), a principal of Pagoda, sent NPI two separate documents entitled "Declaration of Breach, Notification of Contract Expiry and First Demand" ("Demands"). The Demands (1) stated that NPI was in breach, (2) demanded the full contract price

for each of the Contracts, (3) "claimed" the Letters of Credit, and (4) stated that Arvest had been served documents for payment on the Letters of Credit and that funds were to be posted to Pagoda's account no later than June 5, 2008.[1]

On June 5, 2008, NPI filed a Verified Petition for Temporary and Permanent Injunction ("Verified Petition") and Verified And [sic] Application for Temporary Restraining Order ("Motion for TRO") in the District Court for Tulsa County, Oklahoma. In the Motion for TRO, NPI moved for injunctive relief preventing Arvest from honoring Pagoda's demands on the Letters of Credit, arguing that Pagoda had not delivered any scrap metal and that payment by Arvest to Pagoda would facilitate a material fraud on NPI. (Mot. for TRO 4-5.) Pagoda received notice of the Motion for TRO and filed an opposing brief. On the same date, Judge Thomas Thornbrugh held an emergency hearing, heard arguments of counsel, and granted the Motion for TRO. In substance, the TRO entered by Judge Thornbrugh restrained Arvest "from honoring the demands of [Pagoda] under the Standby Letters of Credit entered into between [NPI] and Arvest for the benefit of Pagoda." Judge Thornbrugh set the Motion for Temporary Injunction for hearing on June 26, 2008.

On June 10, 2008, Pagoda filed a Notice of Removal in this Court, alleging the existence of federal subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Specifically, Pagoda alleged that NPI is an Alaska corporation with its principal place of business in Alaska; that Arvest is an Arkansas corporation with its principal place of business in Arkansas; that Pagoda is organized under Hong Kong law and headquartered in Hong Kong; and that the amount in controversy exceeded $75,000.00. On June 12, 2008, Pagoda filed a combined Motion

---

[1] This "account" appears to be located in Austria. (*See* Letter of Credit, Ex. 3 to NPI's Mot. for Prelim. Inj.)

to Dissolve the Temporary Restraining Order and Compel Arbitration ("Motion to Dissolve TRO and Compel Arbitration") (Doc. 6) and a Motion for Expedited Hearing (Doc. 7).  On Friday, June 13, 2008, the Court entered a minute order granting Pagoda's Motion for Expedited Hearing and setting the Motion to Dissolve TRO and Motion to Compel Arbitration for hearing the following Wednesday, June 18, 2008.[2]

On June 16, 2008, NPI filed four documents: (1) Motion to Remand, arguing this Court lacked subject matter jurisdiction because NPI and Arvest are both citizens of Oklahoma (Doc. 15); (2) Motion to Reschedule Hearing and To Clarify Issues To Be Considered at Hearing ("Motion to Reschedule and Clarify") (Doc. 14), requesting that the Court strike the June 18, 2008 hearing; (3) Response to Pagoda's Motion to Dissolve TRO and Compel Arbitration (Doc. 19); and (4) Motion for Preliminary Injunction (Doc. 20).  On June 17, 2008, Pagoda filed substantive responses to the Motion to Remand and Motion to Reschedule and Clarify.

Later in the day on June 17, 2008, Pagoda filed an Agreed Motion for Continuance and For Entry of a Briefing Schedule ("Motion for Continuance") (Doc. 27), in which Pagoda moved the Court to continue the June 18, 2008 hearing for approximately ten days, until June 27, 2008.  On June 18, 2008, the Court granted the Motion for Continuance and set Pagoda's Motion to Dissolve TRO and Compel Arbitration and NPI's Motion for Preliminary Injunction for hearing on July 1,

---

[2]  The Court set the matter for hearing on this date because (1) the TRO issued in state court was one issued without notice, *see Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 432 n.7 (1974) (noting that a TRO issued with "informal, same-day notice" is considered a TRO issued without notice and is governed by the time limitations in Federal Rule of Civil Procedure 65(b)); and (2) a federal court must hear and decide a motion to dissolve a TRO issued without notice "as promptly as justice requires," but must also give the party that obtained the TRO two days notice before the hearing, *see* Fed. R. Civ. P. 65(b)(4).

3

2008.  In the Order granting the Motion for Continuance, the Court advised the parties that it would resolve the Motion to Remand prior to the hearing.  On June 19, 2008, NPI filed its reply in support of its Motion to Remand.  On June 20, 2008, Pagoda filed a Second Agreed Motion for Continuance and For Entry of Briefing Schedule, which the Court granted, and the hearing was continued until August 22, 2008.

On June 25, 2008, the Court entered an Order regarding the Motion to Remand.  The Court stated that, in addition to the issues raised in the Motion to Remand, it was also considering whether removal was procedurally proper since Arvest had not consented to removal.  If Arvest consented to removal, the Court ordered Arvest to so state by July 7, 2008, which was the end of the thirty-day removal period.  *See Henderson v. Holmes*, 920 F. Supp. 1184, 1186 (D. Kan. 1996) (stating that, if a defendant has not signed the notice of removal, such defendant must "independently and unambiguously file notice of its consent and its intent to join in the removal within the thirty-day period").  The Court stated that if Arvest did not consent to removal by such date, the action may be subject to remand due to procedural defect.  The Court allowed the parties to file briefs regarding the impact of Arvest's consent or non-consent to removal by July 9, 2008.  The Court noted that nominal parties need not consent to removal but that Pagoda did not appear to contend that Arvest was a nominal party.[3]

On July 3, 2008, prior to Arvest's deadline for consenting to removal, Pagoda filed an Amended Notice of Removal.  Therein, Pagoda repeated the allegations regarding citizenship that were made in the Notice of Removal.  It also provided "additional bases" for removal, in the event

---

[3] Pagoda argued in its response to the Motion to Remand that Arvest was a citizen of Arkansas, not that Arvest's citizenship should be disregarded based on its status as a nominal party.

that Arvest did not consent to removal.  (Am. Notice of Removal 3.)  Specifically, Pagoda contended

that "Arvest, as the issuing bank for a letter of credit that has neither honored nor dishonored the

letter of credit as of the date of removal, is a nominal party to the action," such that its consent is not

required.  (*Id.*)  Pagoda further contended that "federal subject matter jurisdiction exists pursuant

to 9 U.S.C. § 205" because "the subject matter of the action relates to an arbitration agreement

falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of

June 10, 1958." (*Id.* 4.)

On July 9, 2008, the parties filed their respective briefs regarding the impact of Arvest's non-

consent to removal.  NPI and Arvest argued that Arvest is not a nominal party and that removal was

therefore procedurally defective.  NPI also argued that removal was not authorized by 9 U.S.C. §

205.  Pagoda argued that Arvest is a nominal party whose consent is not required for removal and

that removal was also authorized by 9 U.S.C. § 205.  Thus, all potential bases for federal

jurisdiction, including those raised in the Notice of Removal and the Amended Notice of Removal,

have been briefed and are ripe for consideration.[4]

## II.    Removal Pursuant to 28 U.S.C. §§ 1441(a) and 1446(a)

The statute governing the general procedure for removal provides that "[a] defendant or

defendants desiring to remove any civil action . . . shall file  . . a notice of removal."  28 U.S.C. §

1446(a). Despite ambiguity of the term "defendant or defendants," it is "well established that

removal generally requires unanimity among the defendants."  *Balazik v. County of Dauphin*, 44

F.3d 209, 213 (3d Cir. 1995); *see also Cornwall v. Robison*, 564 F.2d 685, 686 (10th Cir. 1981);

_____

[4] The Court construes NPI's Memorandum of Law Regarding Arvest's Non-Consent to Removal (Doc. 48) as a supplement to its Motion to Remand.  Therefore, NPI has properly raised the procedural defect of Arvest's lack of consent as part of its Motion to Remand.

*Henderson*, 920 F. Supp. at 1186; *Helm v. Drennan*, No. 07-CV-344-CVE, 2007 WL 2128404, at

* 1 (N.D. Okla. July 25, 2007). This "unanimity rule" applies "regardless of whether the removing

parties predicate federal subject matter jurisdiction on diversity or federal question." *Borden v. Blue*

*Cross and Blue Shield of W. New York*, 418 F. Supp. 2d 266, 269 (W.D.N.Y. 2006). If the

unanimity rule is not satisfied, *i.e.*, all defendants fail to join in removal, this is considered a

procedural "defect" in the removal process, which warrants remand pursuant to 28 U.S.C. § 1447(c).

*See Balazik,* 44 F.3d at 213 ("We agree that the failure of all defendants to remove creates a defect

in removal procedure within the meaning of § 1447(c).").

In this case, Arvest, a named Defendant, does not consent to removal. (*See* Arvest's Notice

of Non-Consent to Removal, Doc. 47.) However, Pagoda contends that Arvest need not consent to

removal because Arvest is a "nominal party." *See Balazik*, 44 F.3d at 213 n.4 (stating that the

unanimity rule may be disregarded "where a non-joining defendant is an unknown or nominal

party"); *Thorn v. Amalgamated Credit Union*, 306 F.3d 826, 833 (8th Cir. 2002) (affirming denial

of motion to remand because non-consenting defendant was a "nominal" party); *Selfix, Inc. v. Bisk*,

867 F. Supp. 1333, 1335 (N.D. Ill. 1994) ("A nominal party need not join in the removal petition.").

The Seventh Circuit defined a "nominal defendant" as follows:

> A "nominal defendant" is a person who can be joined to aid the recovery of relief
> without an assertion of subject matter jurisdiction only because he has no ownership
> interest in the property which is the subject of litigation. A nominal defendant holds
> the subject matter of the litigation in a subordinate or possessory capacity as to which
> there is no dispute. Because the nominal defendant is a "trustee, agent, or
> depositary," who has possession of the funds which are the subject of litigation, he
> must often be joined purely as a means of facilitating collection. The court needs to
> order the nominal defendant to turn over funds to the prevailing party when the
> dispute between the parties is resolved. A nominal defendant is not a real party in
> interest, however, because he has no interest in the subject matter litigated. His
> relation to the suit is merely incidental and it is of no moment [to him] whether the
> one or the other side in [the] controversy succeed[s]. Because of the non-interested

> status of the nominal defendant, there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established.

*S.E.C. v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) (internal citations and quotations omitted).  The

Supreme Court has further indicated that a mere "stakeholder" of funds is generally considered a

nominal party.  *See Salem Trust Co. v. Mfrs.' Finance Co.*, 264 U.S. 182, 184 (1924) (holding that

"stakeholder" with whom parties had deposited money pending outcome of dispute was a nominal

party).

### A.      General Law on Letters of Credit

Before addressing whether Arvest is a "nominal party," it is necessary to briefly explain

letters of credit and the obligations of an issuer thereof.  Letters of credit are governed by Article

5 of the Oklahoma Uniform Commercial Code ("OUCC"), which is patterned after the Uniform

Commercial Code ("UCC").  *See* Okla. Stat. tit. 12A, § 5-101-5-119; *In re Slamans*, 69 F.3d 468,

474 (10th Cir. 1995) (stating that Oklahoma has adopted UCC provisions governing letters of

credit).[5]  A letter of credit is defined as "a definite undertaking that satisfies the requirements of §

5-104 of this title by an issuer to a beneficiary at the request or for the account of an applicant or,

in the case of a financial institution, to itself or for its own account, to honor a documentary

presentation by payment or delivery of an item of value[.]"  *Id.* § 5-102(a)(10).[6]  A letter of credit

---

[5]  Both parties cited Oklahoma law in their discussions of the Letters of Credit (*see, e.g.*, Pagoda's Mot. to Dissolve TRO 6; NPI's Br. Regarding Arvest's Non-Consent to Removal 6), and the Court assumes for purposes of this Motion to Remand that Oklahoma law governs the Letters of Credit and Arvest's responsibilities thereunder.

[6]  Although the OUCC does not delineate different types of letters of credit, the Tenth Circuit has explained that "[t]here are two types of letters of credit: commercial and standby."  *In re Slamans*, 69 F.3d at 473.  "The beneficiary of a commercial letter of credit may draw upon the letter simply by presenting the requisite documents showing that the beneficiary has performed

7

involves three parties: "'(1) an issuer (generally a bank) who agrees to pay conforming drafts presented under the letter of credit; (2) a bank customer or "account party" who orders the letter of credit and dictates its terms;[7] and (3) a beneficiary to whom the letter of credit is issued, who can collect monies under the letter of credit by presenting drafts and making proper demand on the issuer.'" *In re Slamans*, 69 F.3d at 474 (footnote added) (quoting *Arbest Constr. Co., Inc. v. First Nat'l Bank & Trust Co.*, 777 F.2d 581, 583 (10th Cir. 1985)).  The "essential function of [a letter of credit] is to assure a party to an agreement that he will receive the benefit of his performance." *In re Slamans*, 69 F.3d at 474.

As a general matter, "an issuer *shall honor* a presentation [by a beneficiary] that, as determined by the standard practice referred to in subsection (e) of this section, appears on its face to strictly comply with the terms and conditions of the letter of credit." *See* Okla. Stat. tit. 12A, § 5-108(a) (emphasis added).  The issuer's obligation to pay on a letter of credit pursuant to § 5-108 is "completely independent from the underlying transaction between the beneficiary and the applicant." *See id.* at § 5-108 Okla. cmt. 1.  "Therefore, the issuer must honor a proper demand even if the beneficiary has breached the underlying contract." *Id.* (citing *Centrefugal Casting Machine Co. v. Am. Bank & Trust Co.*, 966 F.2d 1348 (10th Cir. 1992)).  This doctrine is known as the

---

and is entitled to the funds." *Id.* (quotation omitted).  In contrast, "[a] standby letter requires the production of documents showing that the customer has defaulted on its obligation to the beneficiary, which triggers the beneficiary's right to draw down on the letter." *Id.* (quotation omitted).  Thus, "a standby letter of credit is a kind of hybrid between a commercial letter of credit and an ordinary guaranty," although it "is not a guaranty." *Id.* (quotation omitted).  The Contracts use the term "standby letters of credit" to describe the letters of credit NPI was required to obtain in this case.

[7] The OUCC refers to the bank customer as the "applicant," which is defined as "a person at whose request or for whose account a letter of credit is issued."  Okla. Stat. tit. 12A, § 5-102(a)(2).

8

"independence principle" ("Independence Principle") due to "the independence of the letter of credit

from the underlying commercial transaction." *In re Slamans*, 69 F.3d at 474 (quotation omitted).

The purpose of the Independence Principle is to facilitate payment by the issuer upon a mere facial

examination of the documents submitted by the beneficiary and assure prompt payment. *Id.* Indeed,

"it is often the existence of a dispute over the underlying transaction that prompts the beneficiary

to draw on standby letters of credit, because the letter of credit is an instrument designed to enable

the beneficiary to collect money to which it believes itself entitled and to hold such sums while any

disputes are pending." *Ward Petroleum Corp. v. Fed. Deposit Ins. Corp.*, 903 F.2d 1297, 1299 (10th

Cir. 1990).[8]

There is one statutory exception to the Independence Principle, which can be invoked in

circumstances involving fraud and forgery ("Fraud Exception"). *See* Okla. Stat. tit. 12A, § 5-108(a)

(stating that issuer "shall honor" a presentation that appears to be in compliance with the letter of

credit, "[e]xcept as otherwise provided in Section 5-109," which is the provision governing "fraud

and forgery"). Section 5-109(a) sets forth circumstances under which an issuer may dishonor a

presentation because "a required document is forged or materially fraudulent, or honor of the

presentation would facilitate a material fraud by the beneficiary on the issuer or applicant." Section

5-109(b) specifically authorizes an "applicant" (or the bank's customer) to seek injunctive relief

---

[8] The OUCC was revised in 1997, subsequent to the cited Tenth Circuit decisions discussing the Independence Principle. These Tenth Circuit cases discuss the precursor to § 5-108, which was set forth at § 5-114 and which had different wording than § 5-108. In its briefing, Pagoda cited the former version of the law. (*See* Mot. to Dissolve TRO 6 (citing "12A O.S. Supp. 1984, § 5-114").) However, the Court is satisfied that the Independence Principle was retained in § 5-108 and that Tenth Circuit authority explaining this principle remains good law. *See* Okla. Stat. tit. 12A, § 5-108 Okla. cmt. 1 (stating that an issuer's obligation to pay on a letter of credit is "completely independent" from the underlying transaction and citing *Centrefugal* and *Ward* decisions).

from a court enjoining the issuer from honoring a presentation "[i]f an applicant claims that a required document is forged or materially fraudulent, or that honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant."  As set forth in the Oklahoma Comments, the "fraud exception represents a departure from the golden principle that the [letter of credit] is independent from all underlying dealings. . . . This departure is designed to be minimal and is necessary to cool the heels of an unscrupulous beneficiary willing to claim anything in presented papers so as to exact payment under the [letter of credit]." *Id.* § 5-109 Okla. cmt. According to the UCC Comments, the fraud must be "material," and "material fraud only occurs when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor." *Id.* § 5-109 UCC cmt. 1.

**B.     Arvest's Status as Nominal Party or Real Party in Interest**

In this case, Arvest is the "issuer" of the Letters of Credit; NPI is the "applicant" or "customer" who requested the Letters of Credit; and Pagoda is the "beneficiary" of the Letters of Credit.  A handful of courts have addressed whether issuers of letters of credit, such as Arvest, are nominal parties that need not consent to removal and/or whose citizenship may be disregarded for purposes of diversity jurisdiction.  In some cases, courts have held that the issuer of a letter of credit was a "nominal party."  *See Selfix, Inc. v. Bisk*, 867 F. Supp. 1333, 1337 (N.D. Ill. 1994) (holding that the essence of the case was a contract dispute between the applicant and the beneficiary and that it was "of no moment" to the issuer whether the applicant or the beneficiary succeeded); *Hamilton v. Central Nat'l Bank of Cleveland*, No. C84-1359, 1984 WL 178950 (N.D. Ohio May 9, 1984) (holding that issuer of letter of credit was "merely a stakeholder" who had "no interest in the controversy between the applicant and the beneficiary"); *Tanglewood Mall, Inc. v. Chase Manhattan*

10

*Bank*, 371 F. Supp. 722, 724 n.1 (W.D. Va. 1974) (noting that issuer of letter of credit was "only a stakeholder against whom no substantive claims have been made" and that its presence in case did not destroy diversity jurisdiction).  In one case, the court conversely held that an issuer of a letter of credit was a real party in interest that must consent to removal and whose diversity must be considered for purposes of diversity.  *See Fisher v. Dakota Comm. Bank*, 405 F. Supp. 2d 1089, 1094-1100 (D.N.D. 2005) (rejecting conclusion that issuers of letters of credit must, in all circumstances, be considered "nominal parties" and holding that issuer was real party in interest because applicant had invoked Fraud Exception to Independence Principle) ("To the extent, however, that *Selfix* can be read to support a conclusion that an issuer of a letter of credit is *per se* always a nominal party, and never a real party in interest, such a conclusion is beyond the weight of authority . . ., at least when fraud is claimed.").

The Court finds the *Fisher* decision to be legally persuasive and factually on point.  In *Fisher*, the plaintiff contracted with a German company for the purchase of steel.  The plaintiff provided the German company with a letter of credit, which was issued by a bank.[9]  Upon the arrival of steel in the United States, the German company demanded payment on the letter of credit from the bank.  Before the bank acted on the demand, disputes arose over the quality and delivery location of the steel.  When the German company insisted on payment, the plaintiff filed a lawsuit in state court, naming the German company and the bank as defendants.  The plaintiff alleged, *inter alia*, that the German company's lack of performance amounted to fraud.  The state court issued a

---

[9] In that case, the letter of credit "was chosen as the primary means of making payment for the steel."  *Fisher*, 405 F. Supp. 2d at 1091.  Thus, it was likely a "commercial" letter of credit rather than a "standby" letter of credit, such as that at issue here.  However, this distinction is not relevant to the outcome.

11

temporary restraining order prohibiting the bank from paying on the letter of credit.  Following several months of proceedings in state court, the German company removed the case to federal court, arguing that the bank was a nominal party whose citizenship must be disregarded and that need not consent to removal.

The *Fisher* court acknowledged that "[b]ased on the rule of independence, it *may* be possible in certain cases when an applicant sues a beneficiary on the underlying transaction to make an argument that the issuing bank is only a nominal party, *e.g.*, when no real, present claim for relief is made against the issuer and the issuer is named only to defeat diversity."  *Id.* at 1096.  However, the court determined that the bank was not a nominal party in that case because the plaintiff had raised the Fraud Exception to the Independence Principle, and because the North Dakota Uniform Commercial Code expressly recognized the "right of an applicant to seek injunctive relief against the issuing bank prohibiting payment on the letter of credit."  *Id.*  The court reasoned:

> In this case, plaintiffs seek, in part, to enjoin Dakota Bank from making payment based on allegations of fraud with respect to both the underlying transaction and the presenting documents. Given the provisions of § 41-05-09(2), this is a real and present claim against a statutorily-authorized defendant, which, based on the law previously cited, makes Dakota Bank more than a formal or nominal party. . . . It might very well be that Dakota Bank is not an indispensable party to plaintiffs' claims against Thyssen. Further, in terms of the overall dispute, Dakota Bank probably is a secondary player. But, neither of these things negate an applicant's right under North Dakota law to seek injunctive relief based upon claims of fraud, nor does it make the issuer (a statutorily-authorized defendant as to such claims) a mere nominal party.

*Id.* at 1096-97.  The court further reasoned that the bank was more than a nominal party because "its own funds [were] at risk."  *Id.* at 1097.  The court listed the following "risks and interests" of the bank if it honored the letter of credit:  (1) the risk "it may not recover what it paid out because the plaintiffs are not good for it;" (2) the "costs and delays that may be attendant to any collection effort

against the plaintiffs;" and (3) the risk that plaintiffs could assert a "lack of good faith" defense in any collection action by the bank, since the bank had notice of plaintiffs' claims of fraud against the German company.  *Id.* at 1097-98.  Finally, the court distinguished *Selfix* and other similar cases because there were no allegations of fraud in those cases.  *Id.* at 1098-1100.

The facts of this case are nearly identical to those presented in *Fisher*.  In its Motion for TRO filed in state court, NPI sought injunctive relief against Arvest pursuant to the Fraud Exception contained in § 5-109 of the OUCC.  As its first argument in support of its likelihood to prevail on the merits, NPI cited § 5-109(b), which authorizes a court to enjoin an issuer from honoring a letter of credit if an applicant claims that it would "facilitate a material fraud by the beneficiary on . . . the issuer or applicant."  *See* Okla. Stat. tit. 12A, § 5-109(b).  In its Motion for TRO, NPI argued that Pagoda never delivered any scrap metal and that its representations that it would do so "were deliberate, material, and false."  (Mot. for TRO 5.)  Since that time, NPI has made additional and more specific allegations of fraud.  For example, in its Motion for Preliminary Injunction, NPI alleged that Pagoda, through Utley, made at least four material misrepresentations to a broker named James Moon ("Moon"), all of which induced NPI to enter the Contracts:  (1) that the Argentinian government owned certain scrap yards; (2) that Utley had relationships with Argentinian officials; (3) that Utley obtained good prices from the Argentinian government because it wanted to get rid of the scrap metal; and (4) that shipping containers had been secured and that train cars had been loaded with scrap metal.  (*See* Mot. for Prelim. Inj. 18; *see also* Moon Decl. ¶¶5-13, Ex. 1 to Mot. for Prelim. Inj.)  NPI has clearly alleged that Pagoda's misrepresentations amount to material fraud and that Pagoda has "no colorable right to expect honor" on the Letters of Credit.  *See* Okla. Stat. tit. 12, § 5-109 UCC Cmt. 1.  Based on such fraud, NPI requests that the Court issue injunctive relief

prohibiting Arvest from honoring the demands of Pagoda. Accordingly, just as in *Fisher*, the injunctive relief sought against Arvest is statutorily authorized by the OUCC. A court's ultimate determination of the existence or non-existence of fraud by Pagoda will significantly impact Arvest's rights, risks, and responsibilities regarding the Letters of Credit. *See* Okla. Stat. tit. 12A, § 5-109(a)(2) (stating that if honoring a letter of credit would facilitate a material fraud by the beneficiary on the issuer or the applicant, the issuer, "acting in good faith, may honor or dishonor the presentation," except in certain circumstances listed in § 5-109(a)(1)(i)-(iv)).

In addition, as noted by the court in *Fisher*, Arvest's own money is at stake. Arvest is not merely a stakeholder or depositary for NPI or Pagoda's money. In its Brief Regarding Nominal Party Status, Arvest stated:

> Additionally, Arvest's funds are at risk and it is not merely a stakeholder or escrow agent. If Arvest is required to pay pursuant to the [Letters of Credit], $15,000,000.00 of its funds will be paid out to Pagoda and Arvest will have little or no recourse in obtaining repayment of the funds. NPI likely cannot satisfy the debt as it has represented in its pleadings that Pagoda's fraudulent activities will likely leave NPI unable to satisfy its financial obligation to Arvest. Moreover, Arvest may face the defense of lack of good faith in making the payment in any collection efforts against NPI because of NPI's assertion of material fraud. Additionally, Arvest may be forced to seek repayment from Pagoda, a foreign corporation that does not maintain any permanent offices, a service agent, or any permanent principal place of business, based on current information and belief, in the United States or any other jurisdiction. Thus, Arvest has substantial risk of losing its funds and is a real party in the statutorily authorized cause of action provided in § 5-109 to NPI.

(Arvest Bank's Br. Regarding Nominal Party Status 5.) Although not controlling, the Court finds Arvest's own description of its interests in the litigation to be highly persuasive. Arvest is not disinterested in the underlying dispute between NPI and Pagoda. If NPI is correct and payment on the Letters of Credit would result in a material fraud, Arvest has the right to dishonor payment and

keep its $15 million in this country while the parties resolve their dispute. Obviously, Arvest is interested in the question of whether its $15 million will be sent to an Austrian bank account for the benefit of a Hong Kong corporation, or whether the funds will be maintained in Arvest's possession until the allegations of fraud against Pagoda are resolved.

Therefore, due to the similarities between this case and *Fisher*, and specifically NPI's invocation of the Fraud Exception to seek injunctive relief against Arvest, the Court finds *Fisher* to be the most persuasive authority presented. The Court holds that Arvest is not a nominal party but is instead a real party in interest. As such, Arvest's non-consent to removal renders Pagoda's removal procedurally defective.[10]

## III.    Removal Pursuant to 9 U.S.C. § 205

As an alternative basis for removal, Pagoda argues that removal was proper pursuant to 9 U.S.C. § 205. (Am. Notice of Removal ¶ 10.) This statute provides:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention,[11] *the defendant or the defendants may,* at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. *The procedure for removal of causes otherwise provided by law shall apply,* except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.

---

[10] Because the Court concludes that removal is procedurally defective, the Court does not reach the question of whether the parties are of diverse citizenship for purposes of 28 U.S.C. § 1332.

[11] The "Convention" referred to is the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention"). *See* 9 U.S.C. § 201.

9 U.S.C. § 205 (emphasis added) (footnote added).  This removal provision is broader than the general removal provision codified at 28 U.S.C. § 1441.  *See Carnigal v. Karteria Shipping, Ltd.*, 108 F. Supp. 2d 651, 653 (E.D. La. 2000).  "Most apparent, the Convention Act only requires that the removed action be 'related to' an arbitration agreement or award under the Convention. Under the general removal statute, however, the removed case itself, or sometimes certain separate or independent claims, must either fall under a district court's diversity or federal question jurisdiction."  *Id.*  Pagoda contends that the subject matter of this action, *i.e.*, NPI's claims that Pagoda has engaged in fraudulent dealings, "relates to" the arbitration clauses contained in the Contracts, which "fall under" the Convention.  *See generally Beiser v. Weyler*, 284 F.3d 665 (5th Cir. 2002) (explaining requirements for removal pursuant to 9 U.S.C. § 205).

## A.    Unanimity Rule Applied to 9 U.S.C. § 205

The weight of authority holds that 9 U.S.C. § 205 is subject to the unanimity rule.  *See In re Ocean Marine Mut. Prot. & Indem. Ass'n, Ltd.*, 3 F.3d 353, 355-56 (11th Cir. 1993) (denying petition for writ of mandamus where district court found that removal pursuant to 9 U.S.C. § 205 was defective based on failure of all defendants to join in removal) ("The procedural requirements of § 1446(a) and (b) are generally applicable to a removal under [the Convention] because 9 U.S.C. § 205 provides that '[t]he procedure for removal of causes otherwise provided by law shall apply' . . . ."); *In re Amoco Petroleum Additives Co.*, 964 F.2d 706, 713 (7th Cir. 1992) (denying petition for writ of mandamus where district court found that removal pursuant to 9 U.S.C. § 205 was defective based on failure of all defendants to join in removal); *Employers Ins. of Wausau v. Certain Underwriters At Lloyd's, London*, 787 F. Supp. 165, 167-69 (W.D. Wisc. 1992) (concluding that removal pursuant to 9 U.S.C. § 205 was procedurally defective because not all defendants joined

in removal) (rejecting argument that 9 U.S.C. § 205 is an exception to the unanimity rule and stating that "Section 205 does not give a preference to a foreign company to remove and its legislative history does not indicate a preference for federal courts to decide Convention Act cases over state courts"); *Marine Solutions Serv., Inc. v. Ribelin Lowell & Co. Ins. Brokers of Alaska, Inc.*, No. A05-134, 2005 WL 1880618, at * 2 (D. Alaska July 27, 2005) (finding that removal pursuant to 9 U.S.C. § 205 was procedurally defective because not all defendants consented to removal). *But see Acosta v. Master Maint. & Constr.*, 52 F. Supp. 2d 699, 708 (M.D. La. 1999) (holding that all defendants need not consent to removal when removal is premised on § 205) ("Foreign businesses who understand that their access to federal courts can be denied by one local party defendant are likely to think carefully before contracting with an American business. A construction of § 205 proposed by plaintiffs which requires consent of all defendants would constitute an obstruction to the free flow of foreign trade, a consideration which is not involved in removals under the general removal statute.").

This Court follows the weight of authority and holds that all defendants must join in a removal premised on 9 U.S.C. § 205. Therefore, based on Arvest's lack of consent, Pagoda's removal pursuant to 9 U.S.C. § 205 is procedurally defective.

## B.     Avoidance of Unanimity Rule Based on 28 U.S.C. § 1441(c)

Pagoda appears to concede that the unanimity rule applies to 9 U.S.C. § 205 removals.[12] Instead, Pagoda argues that Arvest's consent was "not required for removal under section 205 because Pagoda's demand for arbitration is a separate and independent claim," as defined in 28

---

[12] Pagoda did not argue, for example, that the Court should reject the majority rule and adopt the reasoning in *Acosta*.

U.S.C. § 1441(c).  (*See* Pagoda's Br. Regarding Impact of Def. Arvest Bank's Lack of Consent to Removal 9.)  Title 28, section 1441(c) of the United States Code provides:  "Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 [federal question jurisdiction] . . . is joined with one or more otherwise non-removable claims . . ., the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates."  As a general rule, "if one defendant's removal petition is premised on removable claims 'separate and independent' from the claims brought against other defendants, consent of the other defendants is not required."  *W.O. Henry v. Indep. Am. Sav. Ass'n*, 857 F.2d 995, 999 (5th Cir. 1988); 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3731 at 267 (3d ed. 1998) ("A significant number of courts have asserted that when a separate and independent claim that is removable under Section 1441(c) is joined with other non-removable claims, only the defendants to the separate and independent claim need seek removal.").  Thus, Pagoda seeks to avoid the unanimity rule based on an exception for cases involving "separate and independent" claims, as defined in 28 U.S.C. § 1441(c).[13]

Pagoda's reliance on 28 U.S.C. § 1441(c) to avoid the unanimity rule is misplaced for several reasons.  In a typical case involving § 1441(c), *a plaintiff* asserts two separate and independent "claims" against one or more defendants, and a defendant removes the case to federal court pursuant to § 1441(c).  *See generally* Wright, Miller & Cooper, *supra*, § 3724 (explaining § 1441(c) and

---

[13] This exception to the unanimity rule is not accepted by all courts.  *See* Wright, Miller & Cooper, *supra*, § 3731 at 268 (citing contrary cases and explaining one court's conclusion that this rule "would commonly allow some defendants . . . to impose their choice of forum not merely on unwilling plaintiffs, but on other unwilling defendants as well") (quotation omitted).

collecting cases arising thereunder).   In this case, Pagoda contends that the "separate and independent" claim that permits removal of the action is Pagoda's own "demand for arbitration" of the claims asserted against it by NPI.   The Court finds that Pagoda's demand for arbitration is not a "claim or cause of action," as contemplated by 28 U.S.C. § 1441(c).   Resolution of the demand for arbitration will merely resolve where the dispute between Pagoda and NPI will be litigated; it will not entitle Pagoda to affirmative relief.   The Court found no case law holding that a "demand for arbitration" was a "claim or cause of action" for purposes of § 1441(c), and Pagoda's two cited cases do not support such a conclusion.   *See W.O. Henry*, 857 F.2d at 999 (finding that a defendant's claim under Fair Housing Act was separate and independent from other state law claims); *Carl Heck Engineers, Inc. v. LaFourche Parish Police Jury*, 622 F.2d 133, 136 (5th Cir. 1980) (holding that a third-party claim for indemnity asserted by one defendant against another defendant was separate and independent from main claim asserted by plaintiff).

Even assuming Pagoda's demand for arbitration is considered a "counterclaim" against NPI, the term "claim or cause of action" used in § 1441(c) generally "does not embrace counterclaims." *UTrue v. Page One Science, Inc.*, 457 F. Supp. 2d 688, 690 & n.4 (E.D. Va. 2006) (collecting cases). "[W]ere counterclaims permitted to become a basis for jurisdiction on removal, the result would be an unwarranted and nearly limitless expansion of removal jurisdiction," and "[s]uch a result is plainly contrary to the scope and intent of § 1441(c)." *Id.*   Indeed, it seems contrary to general removal principles that Pagoda could render this entire case removable simply by inserting a removable controversy into the litigation, *i.e.*, whether the case should be arbitrated pursuant to the Convention.   *Cf.* Wright, Miller & Cooper, *supra*, § 3724 at 32-33 (explaining that the assertion of

defenses cannot render a case removable because § 1441(c) refers to a "'claim or cause of action,' rather than to a 'controversy,' which might be interpreted as including defensive matters").

Also supporting the conclusion that counterclaims cannot be considered a "claim or cause of action" for purposes of § 1441(c), the weight of commentators and courts agree that § 1441(c) "applies only to claims joined by the plaintiff or plaintiffs," rather than a claim interjected into the case by another party, *e.g.*, a third-party claim, a cross-claim, or a counterclaim. *See* Wright, Miller & Cooper, *supra*, § 3724 at 40 & nn.62-63 (collecting cases); s*ee also First Nat'l Bank of Pulaski v. Curry*, 301 F.3d 456, 465 (6th Cir. 2002) (concluding that § 1441(c) should be interpreted "narrowly to apply only to claims joined by the plaintiff in the original state court action"); *Lawyers Title Ins. Corp. v. Pioneer Nat'l Title Ins. Co.*, 600 F. Supp. 402, 405 (D.S.C. 1984) (reasoning that "§ 1441(c) should be limited to the situation involving a joinder of claims by the plaintiff"). *But see Carl Heck Engineers, Inc.*, 622 F.2d at 135 ("permitt[ing] removal on the basis of a third party claim where a separate and independent controversy is stated"). Thus, according to the weight of authority, the fact that the alleged "separate and independent claim" was joined into the controversy by Pagoda, rather than NPI, renders § 1441(c) inapplicable.

Finally, even assuming a demand for arbitration by a removing defendant could be considered a "claim or cause of action" for purposes of § 1441(c), the claim asserted by Pagoda is not "separate and independent" from the claims asserted by NPI. In *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 14 (1951), the Supreme Court held that "where there is a single wrong to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c)." The *Finn* test, which remains

20

governing precedent, has been described as "restrictive." *See* Wright, Miller & Cooper, *supra*, §

3724 at 18.  Commentators have summarized the *Finn* test as follows:

> It seems reasonable to conclude that claims involving common questions and
> stemming from the same transaction or event do not qualify as separate and
> independent claims or causes of action under the Supreme Court's formulation.  The
> *Finn* case held that there is but a single cause of action when a single plaintiff
> advances alternative claims against a number of defendants arising from an
> interlocked series of transactions or events, inasmuch as there is but a single wrong
> to the plaintiff.

*See id.* at 17-18; *see also Snow v. Powell*, 189 F.2d 172, 174 (10th Cir. 1951) (interpreting §

1441(c)) ("The word 'separate' means distinct; apart from; not united or associated. The word

'independent' means not resting on something else for support; self-sustaining; not contingent or

conditioned.").

The Court located two cases addressing whether a claim removed pursuant to 9 U.S.C. § 205

was a "separate and independent claim," such that removal of the case was proper pursuant to 28

U.S.C. § 1441(c).[14]  In both cases, the arbitration provision giving rise to removal pursuant to 9

U.S.C. § 205 was contained in an indemnity agreement or insurance policy that was entirely separate

from the claims originally asserted by the plaintiff.  *See Acme Brick Co. v. Agrupacion Exportadora*

*de Maquinaria Ceramica*, 855 F. Supp. 163, 165-68 (N.D. Tex. 1994) (holding that a cross-claim

for indemnity asserted by one defendant against a second defendant, which was removed by the

second defendant pursuant to 9 U.S.C. § 205 based on an arbitration provision within the indemnity

agreement, was "separate and independent" from the plaintiff's claims, which were for breach of

an entirely different contract) (further holding that, due to separate and independent nature of

---

[14]  Both cases are out of the Fifth Circuit, which, as explained above, appears to be one of
the few jurisdictions that allows removal pursuant to § 1441(c) based on "claims" asserted by
parties other than the plaintiff.

removed claim, the first defendant's consent was not required for removal); *Lannes v. Operators, Int'l*, No. 04-584, 2004 WL 2984327, at ** 9-11 (E.D. La. Dec. 20, 2004) (holding that a cross-claim for indemnity asserted against one defendant by a second defendant, which was removed by the second defendant pursuant to 9 U.S.C. § 205 based on an arbitration provision within an insurance policy, was "separate and independent" from the plaintiff's claims of negligence). In *Lannes*, the court reasoned:

> Operators' cross-claim for defense and indemnity is premised on coverage pursuant to the West of England insurance policy and the obligations existing thereunder. In contrast, plaintiff's claims against the co-defendants in this case, Ryan Walsh and Operators, are based upon their negligence and/or the unseaworthy condition of the D/B FRANK L which allegedly caused plaintiff's injuries. Neither plaintiff nor any of the co-defendants allege that West of England's conduct caused plaintiff's injuries. Therefore, contrary to movants' contentions, this case involves more than the violation of a "single primary right" or "redress for one legal wrong." *Finn*, 341 U.S. at 13, 71 S.Ct. at 539-40. Instead, whereas plaintiff's personal injury claims are premised on the violation of a primary right of the plaintiff, "namely, the right of bodily safety," *id.*, Operators' cross-claim seeks redress for a second and distinct legal wrong allegedly done to Operators, namely West of England's failure to provide Operators with defense and indemnity pursuant to the insurance policy.

*Id.* at * 9.

In this case, the arbitration provision giving rise to removal pursuant to 9 U.S.C. § 205 is contained in the Contracts, which are at the heart of the lawsuit initiated by NPI. NPI alleges that Pagoda committed material fraud in procuring the Contracts and that Arvest, as a result, is precluded from honoring the Letters of Credit. It is clear that all potential "claims," including Pagoda's demand for arbitration, arise from an "interlocked" series of transactions or events, namely NPI and Pagoda entering into the Contracts and Pagoda's demands for payment on the Letters of Credit. Therefore, Pagoda's demand for arbitration, which is based on language in the Contracts, cannot be considered "separate and independent" from the original claims brought by NPI. In addition, in

both *Acme* and *Lannes*, there was an actual cross-claim asserted *against* the removing party, and the removing party sought to demand arbitration of such "claim" in federal court.  Here, there is no separate "claim;" there is only the demand of Pagoda, the removing party, to arbitrate the dispute originally initiated by NPI.  This further illustrates the procedural differences between this case and other cases in which the "separate and independent" claim provision has enabled a defendant to avoid the unanimity rule.[15]

In summary, the Court concludes:  (1) Arvest is a real party in interest; (2) Arvest's lack of consent to removal renders Pagoda's removal procedurally defective, regardless of whether removal is pursuant to the general removal statutes or 9 U.S.C. § 205; and (3) Pagoda's attempt to escape the unanimity rule on grounds that its demand for arbitration is a "separate and independent claim" pursuant to 28 U.S.C. § 1441(c) is unavailing.  Accordingly, the Court finds that Pagoda's Notice of Removal and Amended Notice of Removal are procedurally defective, and NPI's Motion to Remand (Doc. 15) is hereby GRANTED.  The case is REMANDED to the District Court for Tulsa County, Oklahoma pursuant to 28 U.S.C. § 1447(c).

**ORDERED THIS 8th DAY OF AUGUST, 2008.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

---

[15]  Because the Court concludes that removal pursuant to 9 U.S.C. § 205 is procedurally defective, the Court does not reach the question of whether Pagoda has met the statutory requirements for removal pursuant to 9 U.S.C. § 205.

23